CABELA'S, INC., APPELLANT, V. CHEYENNE COUNTY BOARD OF EQUALIZATION, APPELLEE.
597 N.W. 2d 623

Filed Aug. 3, 1999.   No. A-98-752.

J. Todd Weber, of Matzke, Mattoon & Weber, and Michael C. Cox, of Koley, Jessen, Daubman & Rupiper, P.C., for appellant.

Paul B. Schaub, Cheyenne County Attorney, for appellee.

IRWIN, Chief Judge, and MUES and INBODY, Judges.

MUES, Judge.

## INTRODUCTION

Cabela's, Inc., appeals the order of the Nebraska Tax Equalization and Review Commission (TERC) modifying the decision of the Cheyenne County Board of Equalization (Board) by valuing the business located at Lot 1, Block 1, Cabela's First Addition in Sidney, Nebraska, at $3,989,905 for tax year 1997. TERC reduced the Board's valuation because the value of an elevator was significantly overstated. On appeal, Cabela's primary argument is that TERC erred in not further reducing the valuation of the subject property. We conclude that Cabela's did not introduce sufficient probative evidence to prove that TERC's actions were arbitrary or unreasonable. Therefore, we affirm TERC's order.

## BACKGROUND

Cabela's owns property located in Sidney. The subject property, a retail store with 77,190 square feet, including mezzanine levels, warehouse storage, and offices, was built in 1991 for approximately $5 million. The building has a 36-foot atrium skylight, a concrete block exterior covered with "Colorado moss stone and dryvit," and a glass storefront entry. All parties agree that the store is overbuilt for its location. It is a retail building designed to promote the high quality of hunting, fishing, and outdoor products sold by Cabela's. Approximately 1 million persons visit the store annually.

For tax years 1992 to 1996, the property was valued at $5,035,744. In 1997, the property was valued at $4,775,310: $204,240 for the land and $4,571,070 for the improvements. Cabela's filed a protest with the Board. The Board found that certain personal property, including an aquarium and a concrete "mountain," were improperly included in the property valuation and, thus, reduced the valuation to $4,104,335: $204,240 for the land and $3,900,095 for the improvements. In arriving at the improvement figure, the replacement cost new of the building was determined to be $6,000,095, using Marshall and Swift valuation service (Marshall-Swift), and a depreciation of $2,100,000 (35 percent) was deducted. Cabela's appealed to TERC.

A hearing was held on June 23, 1998. Cabela's evidence consisted mostly of the testimony and exhibits of its appraiser, Richard See. See testified that the Cabela's store is basically a "retail box store," like a Wal-Mart or K mart, which is substantially overbuilt for Nebraska and the Midwest. He testified that the store was deliberately overimproved and overbuilt to show the high quality of Cabela's products and to project an image, and that at the time of construction, the owners knew they would certainly take a loss if it was sold.

See testified that the fair market value of the subject property was $2,850,000. He explained that he arrived at this valuation by using the normal appraisal process through three approaches to valuation: replacement cost, direct sales comparison, and income capitalization. He stated that he used all three approaches because there was sufficient data available and all three are generally required if data is available.

In his replacement cost approach, See based the land value on the sale of one parcel of land in Sidney over the past 2 years. It sold for $9,562 per acre. He adjusted this to $12,500 per acre for the cost of installing utilities, yielding a land value for the subject property of $187,500. His base cost for the building was $5,150,072 less depreciation of $3,216,636, for a total depreciated replacement cost of $1,933,435. See included depreciated site improvements at $620,000 and entrepreneurial profit at $124,000 to arrive at his total valuation of $2,865,000, which he

then rounded to $2,850,000 to arrive at his final estimation of market value.

See also performed an assessment comparison. The comparable properties he used included the Safeway store in Sidney; Cabela's office in Sidney; the ALCO store in Sidney; Monument Mall in Scottsbluff, Nebraska; Hobby Lobby in Kearney, Nebraska; Target in Kearney; two Wal-Mart buildings in Kearney; and the Cabela's store in Kearney. In these comparisons, he found assessed values per square foot ranging from the Cabela's in Kearney at $8.54 to Monument Mall at $38.99. According to See, the subject property is assessed at $50.53 per square foot.

For his direct sales comparison, See used two K mart stores in Lincoln, Nebraska; a Russ's Market in Lincoln; an OfficeMax in Omaha, Nebraska; Linen 'N Things in Omaha; K mart in Scottsbluff; Wal-Mart in Scottsbluff; and Wal-Mart in Grand Island, Nebraska, as comparable. The price per square foot ranged from $150 to $25.35. He gave greatest weight to the Scottsbluff sales of $25.35 and $26.49 and adjusted upward for Cabela's superior quality to arrive at an estimated value of $35 per square foot or $2,701,650. Using these same properties and a gross income multiplier with potential income, See estimated the market value at $2,895,733. He opined that based on a direct sales comparison, the value of the property was $2,850,000.

In his income capitalization approach, which See asserted was most reliable, he used the following comparables: Stein Mart in Lincoln, Russ's Market in Lincoln, ShopKo in Lincoln, Best Buy in Lincoln, two OfficeMaxes in Omaha, K mart in Omaha, Monument Mall in Scottsbluff, and Wal-Mart in Kearney. Using net operating income and an overall capitalization rate of .097, he estimated the value of the subject property at $2,848,752, rounding it to $2,850,000.

See agreed that these properties all had varying degrees of differences from the subject property. Those differences included quality of construction, size, location, and year built. He testified that he made adjustments throughout each of the three different approaches. His adjustments are not documented in his appraisal, nor are they explained in his testimony. In regard to his direct sales comparison approach, See admitted

that the best supporting information, evidence of comparable sales, was absent in this case because there had not been any similar sales in Sidney. He acknowledged that for these reasons, this approach is weakened and becomes less persuasive. Thus, he gave this approach only secondary weight in his analysis. See admitted that his cost calculation included a total depreciation of over $3 million and that the shortcomings of the cost approach normally result from depreciation calculations because obsolescence is difficult to measure. See admitted that he gave the cost approach only secondary weight in his analysis because it has less reliability.

See opined that the Board's valuation was problematic because (1) it used *only* the cost approach and (2) it did not consider functional or external depreciation in doing so. See also noted the erroneous elevator calculation, which valued the elevator at $77,000 when it actually cost closer to $20,000, and the problem with an acoustical ceiling finish being overestimated. However, he admitted that he did not conduct a review appraisal. Moreover, he admitted that the cost approach is deemed to be most appropriate for valuing unique properties if it is used to its full extent and all depreciation is considered.

The Board presented the majority of its evidence through Susan Lore, its appraiser, and Norma Rogers, the Cheyenne County assessor. Rogers testified that the subject property was assessed in the same manner as all commercial properties in Cheyenne County, by using Marshall-Swift. Lore, a general certified appraiser since 1991, testified that the subject property was valued in tax year 1997 at $4,104,335: $204,240 for the land and $3,900,095 for the improvements. She explained that she used a cost approach which also considered sales because she used sales to come up with an overall depreciation rate of 35 percent. She testified that there was "very little data" in regard to rental property, so no income capitalization analysis was performed. Lore testified that she applied no economic depreciation because the area is "commanding other businesses to come in" and that thus, her data showed that there was no need for economic or external depreciation.

Lore admitted that she had not physically inspected the entire store, instead, relying on physical measurements taken by

another appraiser. She explained that this is common practice for mass appraisals in which a physical inspection is only reconducted if there is a reason or a problem. She opined that there were no properties which were comparable to the subject property, as it was of a far better quality. She did not submit a detailed written appraisal, stating that it was typically not done in mass appraisals.

TERC found that the cost approach utilized by the Board was a professionally accepted mass appraisal method recognized by Neb. Rev. Stat. § 77-112 (Cum. Supp. 1998) and was the most appropriate method of valuing the subject property because it was highly unique and sales and income data were scarce. It found that the comparables utilized by See in his appraisal differed substantially in terms of quality, style, age, size, amenities, functional utility, and physical condition and, thus, required substantial adjustments which were not set forth in his appraisal. TERC thus found See's appraisal to be unpersuasive.

TERC further found that See's evidence of land values was unpersuasive because he limited his sales to one sale within 2 years, when Lore testified that there had been several properties purchased and developed in the past 5 years. Finding that the value of an expert opinion is no stronger than the facts upon which it is based, TERC essentially adopted the Board's valuation except its value of the elevator. TERC found that the value of the elevator was significantly overstated in the county's appraisal and that there was insufficient evidence to establish its true value. Thus, it found that the Board's assessed value was unreasonable, arbitrary, and not supported by the evidence. It reduced the 1997 valuation of the subject property to $3,989,905, including $204,240 for the land and $3,785,665 for the improvements. Cabela's now appeals to this court, alleging that TERC did not go far enough in reducing the assessed value of its property.

## ASSIGNMENTS OF ERROR

Cabela's argues that TERC erred in (1) failing to accurately assess the actual value of the property, (2) unreasonably and arbitrarily utilizing the Board's valuation amounts in determining the actual value of the property, (3) failing to deduct from

the replacement cost value functional and economic obsolescence, (4) failing to use the income capitalization and direct sales comparison approaches when determining fair market value, (5) failing to use the assessed value of comparable properties when determining the fair market value, (6) failing to use the evidence of land value when determining the fair market value, (7) determining the fair market value based on incompetent evidence, and (8) failing to accurately equalize the assessment when compared to comparable properties within Cheyenne County.

## STANDARD OF REVIEW

Appellate review of a final decision of TERC shall be conducted for errors on the record of TERC. *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999); *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal.*, 6 Neb. App. 838, 578 N.W.2d 465 (1998); Neb. Rev. Stat. § 77-5019 (Cum. Supp. 1998). When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

## ANALYSIS

TERC shall affirm the action taken by the county board of equalization unless evidence is adduced establishing that the action taken by the board was unreasonable or arbitrary, or unless evidence is adduced establishing that the property of the appellant is assessed too low. Neb. Rev. Stat. § 77-1511 (Reissue 1996); *US Ecology v. Boyd Cty. Bd. of Equal., supra.*

There is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. The burden of showing such valuation to be unreasonable rests upon the taxpayer on

appeal from the action of the board. *US Ecology v. Boyd Cty. Bd. of Equal., supra*; *Lancaster Cty. Bd. of Equal. v. Condev West, Inc.*, 7 Neb. App. 319, 581 N.W.2d 452 (1998).

Cabela's argues that it overcame the presumption by introducing competent evidence demonstrating that the Board acted in an arbitrary and unreasonable manner. Indeed, TERC specifically found that the Board acted in an arbitrary and unreasonable manner. Thus, we agree with Cabela's assertion that it overcame the presumption that the Board faithfully performed its assessment duties. However, the burden of proof remained on Cabela's to show that the Board's valuation was unreasonable. See *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal., supra.*

The burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the taxpayer's property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal., supra.* It must be demonstrated by evidence that the assessment is grossly excessive and is a result of arbitrary or unlawful action, and not a mere error of judgment. *Id.* In tax valuation cases, actual value is largely a matter of opinion and without a precise yardstick for determination with complete accuracy. *US Ecology v. Boyd Cty. Bd. of Equal., supra.*

Cabela's assignments of error Nos. 1 to 4, 6, and 7, can reasonably be condensed into the contention that TERC is not accurately assessing the actual value of the property by unreasonably and arbitrarily accepting the Board's valuation figures which (1) ignored functional and economic obsolescence, (2) failed to use the income capitalization and direct sales comparison approaches, and (3) based the fair market value on incompetent evidence. These assigned errors will be discussed together.

Essentially, Cabela's argues that TERC erred in adopting the Board's valuation figures, rather than the valuation figures of its own expert, See. It argues that the property "is substantially over-improved for its location and therefore its actual value, grounded upon a market based standard, is much less than it

might otherwise be in another location and certainly less than the Board's valuation." Brief for appellant at 19. Cabela's further argues that the replacement cost valuation method is not the only relevant method in determining the actual value of a unique property, and in any event, the cost approach utilized by the Board and adopted by TERC was arbitrary and unreasonable. In support thereof, Cabela's asserts that the reproduction costs were erroneous and that the amount of depreciation, 35 percent, used by the Board was erroneous, as it did not consider economic depreciation and was not detailed enough to ascertain whether Lore considered physical depreciation. Cabela's argues that its evidence of value was more competent in these regards and, thus, should have been adopted.

*Method of Valuation.*

Section 77-112 provides that the actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal methods, including, but not limited to: (1) sales comparison approach, taking into account factors such as location, zoning, and current functional use; (2) income approach; and (3) cost approach. Section 77-112 requires use of applicable statutory factors, individually or in combination, to determine the actual value of real estate for tax purposes. See, *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999); *First Nat. Bank v. Otoe Cty.*, 233 Neb. 412, 445 N.W.2d 880 (1989); *Forney v. Box Butte Cty. Bd. of Equal.*, 7 Neb. App. 417, 582 N.W.2d 631 (1998). Pursuant to § 77-112, the statutory measure of actual value is not what an individual buyer may be willing to pay for property, but, rather, its market value in the ordinary course of trade. See *US Ecology v. Boyd Cty. Bd. of Equal., supra.*

In valuing the subject property, Lore testified that she rejected the market and income approaches because there was insufficient data from which to extrapolate a sale price or rent for the property. Lore explained that she contacted several state and local agencies for assistance with similar sales and that she was told that there were no comparable sales that fit this situation.

She also testified that very little data was submitted at the time a study was performed regarding the income approach. Lore explained that the quality of the Cabela's store was far better than anything else that "we had out there" and that there were simply no buildings comparable in size and quality to the Cabela's store. Thus, she relied upon the cost approach and determined the cost of the property's improvements by using a 1995 Marshall-Swift manual. The Marshall-Swift manual provides, based on quality of construction, different square-foot costs for reproduction. From the reproduction cost, Lore deducted physical and functional obsolescence/depreciation at a 35-percent rate.

Although Cabela's acknowledges that the cost approach is one of the accepted mass appraisal techniques by which actual value of real property can be calculated, it asserts that TERC erred in failing to use the income capitalization and direct sales comparison approach when determining fair market value. It also disputes Lore's testimony that sales and income data were scarce and disagrees with TERC's conclusion that the cost approach is the most appropriate method for valuing unique properties.

The Board asserts that the cost approach was the most appropriate method of valuation in the instant case and thus, that TERC correctly adjusted the assessed valuation of the property.

> The cost approach usually works best for newer improvements, because construction costs are easier to estimate and there is less depreciation. This approach is especially useful for appraisal of properties for which sales and income data are scarce. Such data are often difficult to obtain for special-purpose and industrial properties.

International Association of Assessing Officers, Property Assessment Valuation 127-28 (2d ed. 1996).

Based on Lore's testimony that there was insufficient data to conduct sales and income approaches to valuation, we conclude that TERC's determination that the cost approach was the most appropriate method for valuing the subject property was based on competent evidence and was neither arbitrary, capricious, nor unreasonable. This is especially so in light of its finding that See's comparables were not truly comparables, which has the

effect of rendering his sales and income analyses ineffective and unpersuasive.

*Depreciation and Obsolescence.*

Cabela's also alleges that even if the cost approach is most appropriate, the cost analysis utilized by the Board and adopted by TERC was arbitrary and unreasonable. First, it alleges the valuation of the elevator and the acoustical ceiling tile are excessive. The entire value of the elevator was deducted by TERC, resulting in a value of $0 for the elevator. Thus, there can be no error in the overvaluation of the elevator. In regard to the ceiling tile, Cabela's argument fails to cite to supporting documentation. It does not set forth what value was placed upon it by the Board or what value was placed upon the ceiling tile by See. Furthermore, TERC obviously did not find any error in the Board's appraisal with regard to the ceiling tile. Thus, we will address this issue no further.

Cabela's main contention is that the Board did not apply a proper amount of depreciation to arrive at a fair market value. It is undisputed that the subject property, along with all commercial properties in Cheyenne County, was allowed a 35-percent depreciation factor for "physical and functional depreciation." Cabela's alleges that Lore's appraisal is not detailed enough to ascertain whether she considered physical depreciation. It also alleges that the Board erred in failing to allow for economic depreciation and that Lore misconstrued the nature of economic obsolescence. While See's written appraisal contained definitions, neither See nor Lore offered testimony to explore or fully distinguish functional from economic depreciation.

Cabela's maintains that the location of the property in a sparsely populated area results in economic obsolescence and that the failure to consider such was arbitrary and unreasonable. Cabela's maintains that See's use of a 55-percent depreciation rate was more appropriate than Lore's because See took into account the location of the property. It concludes that See's evidence was competent and should have been relied upon, rather than the erroneous calculations and valuations submitted by the Board. Cabela's disputes TERC's finding that See's opinion was

not persuasive and asserts that TERC erred in ignoring his opinion.

> Physical depreciation results from deterioration of the improvements over time. Functional depreciation or obsolescence results from lack of market acceptance due to the obsolete nature of improvements, inability to recover the cost of unique features of a building suited to one business but unusable if the building is sold to another type of business, and decreased value caused by an improvement that is "overbuilt" in relation to the locale or community where the structure is situated. Economic depreciation results from external economic forces which depress the value of the property.

*First Nat. Bank v. Otoe Cty.*, 233 Neb. 412, 414, 445 N.W.2d 880, 882 (1989).

Lore testified that she relied upon a market sales analysis of sales in Cheyenne County to arrive at the market depreciation that was applied to individual properties in Cheyenne County. To determine this rate, she used sales in the county to determine a building residual which is divided by the replacement cost new to determine an overall depreciation rate. Using this calculation, she determined that a rate of 35-percent functional/physical depreciation should be applied to the subject property. Indeed, Lore testified that she used this depreciation rate for all commercial property within the county. She explained that the economy in Sidney was growing, especially at the location of this property, and that thus, she did not apply any economic depreciation.

It seems apparent to us that Lore considered the locale of the subject property in her functional depreciation analysis and considered, but did not deem appropriate, economic depreciation. Using the definitions from *First Nat. Bank v. Otoe Cty., supra*, functional depreciation takes into account the uniqueness of a property in relation to where it is located. See defines functional obsolescence as "innate inadequacy or super-adequacy [overbuilt]." In See's replacement cost analysis, he did not include in his base replacement cost, the value of the 36-foot atrium, the elevator, the mezzanine levels, and "etc." This omission was purposely made because these items (and apparently

undisclosed others, i.e., "etc.") contributed to the "overbuilt" nature of the improvement. See took "functional obsolescence" into account in his replacement cost appraisal by not considering these overimprovements in his base cost. This method resulted in See arriving at a base cost of $5,150,072. See then deducted 55 percent of that base cost for what he characterized as economic obsolescence, which he defined as coming from a cause outside the property, including its location. Lore's base cost was $6,000,095, from which she deducted 35 percent for functional physical depreciation. See admitted that depreciation calculations are difficult to arrive at and are subjective in nature.

Based on the record before us, we cannot conclude that TERC acted arbitrarily and unreasonably in rejecting See's depreciation analysis and accepting Lore's.

*Competent Evidence of Value.*

It is clear from the record that the Board generally considered Lore's testimony and recommendations to be more persuasive than those given by See. Lore testified that based on a cost approach, which considered market sales in its depreciation rate of 35 percent, the subject property's value was $4,104,335. Cabela's argues that since Lore did not rely upon her own personal inspection of the property, there is no presumption that the official assessment is valid. See *Grainger Brothers Co. v. Board of Equalization*, 180 Neb. 571, 144 N.W.2d 161 (1966). It concludes that because Lore's opinion carried no presumption of validity and the Board relied upon it for its decision, the Board's decision is entitled to no presumption of validity. Thus, Cabela's surmises that the reasonableness of the valuation fixed by the Board became a question of fact based upon the evidence presented to TERC. Cabela's recognizes that even though the presumption of validity disappears, it still had the burden to prove the unreasonableness of the Board's valuation. See *Lancaster Cty. Bd. of Equal. v. Condev West, Inc.*, 7 Neb. App. 319, 581 N.W.2d 452 (1998).

As stated, TERC found that the Board's decision was arbitrary and capricious and thus, that it was not entitled to the presumption. Therefore, the reasonable valuation of the subject property became a question of fact. TERC accepted Lore's val-

uation figures. Although Lore testified that she was not the appraiser who performed the original measurements of the subject property, she also testified that she had been in the store several times and had conducted measurements of the receiving and storage addition. Lore explained that in mass appraisal, an appraiser does not generally return to the site to conduct a physical inspection appraisal unless there is a problem. Thus, it is apparent that no error was committed when she relied upon a prior appraiser's physical measurements. Indeed, both she and See used the same square footage measurements totaling 77,190. This argument is without merit.

Cabela's also asserts that it carried its burden and demonstrated that the Board's valuation was arbitrary and unreasonable. To overcome its burden of proof, Cabela's must have produced evidence establishing that the Board's valuation of the subject property at $4,104,335, less the elevator adjustment made by TERC in regard to the elevator, was unreasonable or arbitrary.

Cabela's has a right to have its property assessed at actual value. See *Lancaster Cty. Bd. of Equal. v. Condev West, Inc., supra.* " 'Actual value' " has been held many times to mean exactly the same as " 'market value' " or " 'fair market value.' " *Dowd v. Board of Equal.*, 240 Neb. 437, 444, 482 N.W.2d 583, 588 (1992). Cabela's attempted to prove the value of the subject property through See's appraisal. TERC specifically found that See's evidence of land value was limited to one sale within 2 years' worth of sales, that there had been several properties purchased and developed since 1992, and thus, that See's evidence of land value was unpersuasive. It further found that See's "comparables" differ substantially from the subject property in terms of overall quality, style, age, size, amenities, functional utility, and physical condition and that their use would require substantial adjustments. Since See did not set forth the types or amounts of adjustments used, TERC found his appraisal unpersuasive.

The value of the opinion of an expert witness is no stronger than the facts upon which it is based. *Bottorf v. Clay Cty. Bd. of Equal.*, 7 Neb. App. 162, 580 N.W.2d 561 (1998). The weight to be given to expert testimony, and the credibility

of witnesses, is a fact question to be decided by the fact finder at trial. *Coffey v. Mann*, 7 Neb. App. 805, 585 N.W.2d 518 (1998). We cannot conclude that TERC's failure to accept See's opinion as persuasive evidence of value was arbitrary, capricious, or unreasonable.

*Assessed Value of Comparable Properties.*

Cabela's final assignments of error address TERC's alleged failure to equalize the assessment of its property with comparable properties in Cheyenne County.

Neb. Rev. Stat. § 77-1501 (Cum. Supp. 1998) provides, in pertinent part, that the county board of equalization shall fairly and impartially equalize the values of all items of real property in the county so that all real property is assessed uniformly and proportionately. For purposes of equalizing the valuation of any real property, the county board of equalization shall make its adjustment so that the value of the real property compares to the average level of value of the class or subclass of property in which the real property is classified. *Id.*

Equalization is the process of ensuring that all taxable property is placed on the assessment rolls at a uniform percentage of its actual value. *Scribante v. Douglas Cty. Bd. of Equal.*, 8 Neb. App. 25, 588 N.W.2d 190 (1999). The purpose of equalization of assessments is to bring assessments from different parts of the taxing district to the same relative standard, so that no one part is compelled to pay a disproportionate share of the tax. *Id.* Where it is impossible to secure both the standards of the true value of a property for taxation and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law. *Id.* If a taxpayer's property is assessed in excess of the value at which others are taxed, then the taxpayer has a right to relief. *Id.* However, the burden is on the taxpayer to show by clear and convincing evidence that the valuation placed upon the taxpayer's property when compared with valuation placed on other similar property is grossly excessive. *Future Motels, Inc. v. Custer Cty. Bd. of Equal.*, 252 Neb. 565, 563 N.W.2d 785 (1997).

Cabela's asserts that two other Cheyenne County retailers, ALCO and Forest Lumber, were being taxed at substantially

lower rates per square foot than it was. It argues that TERC failed to conduct any analysis of the inequity issue in its order even though the issue was raised by Cabela's. These properties are being taxed based on assessed value which calculates out at $13 per square foot and $12.58 per square foot respectively. According to Cabela's, its property is being assessed at a value which equates to over $60 per square foot. If the properties which Cabela's selects are comparable to, or within the same class as, the subject property, there is obviously a serious problem in the assessments. However, the evidence does not support the contention that the ALCO discount store and Forest Lumber, although both are certainly retail businesses like Cabela's, are comparable to the subject property.

Rogers, the Cheyenne County assessor, testified that to ensure uniformity and fairness in valuation, the county has an appraisal performed and utilizes Marshall-Swift. She testified that this valuation process was uniformly applied to all commercial properties in Cheyenne County, including the subject property. The Board submitted evidence regarding the assessed value of a local bank property. Both the bank and Cabela's were assessed using "excellent" quality ratings for replacement cost purposes. The bank's assessed value was $144.79 per square foot on the second floor and $100.36 per square foot on the first floor. Using similar county records, Cabela's property is assessed at only $76.18 per square foot. The reality is that Cabela's property has no equal in Cheyenne County, a fact it readily accepts and a distinction it diligently sought to achieve.

When a county board of equalization has determined the value of property, uniformly and impartially assessed through a formula in substantial compliance with statutes governing taxation, for reversal of the board's action a taxpayer must show more than a difference of opinion concerning the assessed value of the taxpayer's real estate. *First Nat. Bank v. Otoe Cty.*, 233 Neb. 412, 445 N.W.2d 880 (1989).

From our review of the record, we conclude that Cabela's has not sustained its burden to prove that the property valuation was arbitrarily or unlawfully fixed in an amount greater than the property's actual value or that the property was not fairly and

proportionately equalized with other property in Cheyenne County.

## CONCLUSION

After reviewing the record, we conclude that Cabela's presented sufficient evidence at the TERC hearing to prove that the Board acted in an unreasonable or arbitrary manner, but only as to the overvaluing of the elevator. TERC's adjustment for the value of the elevator, and its subsequent valuation of the Cabela's property at $3,989,905, $204,240 for the land and $3,785,665 for the improvements, conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

AFFIRMED.