OMAHA COUNTRY CLUB, APPELLANT, V. DOUGLAS COUNTY
BOARD OF EQUALIZATION ET AL., APPELLEES.
645 N.W.2d 821

Filed May 28, 2002.   Nos. A-01-679 through A-01-684.

Danene J. Tushar and Aimee A. Demulling, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellant.

James S. Jansen, Douglas County Attorney, and James R. Thibodeau for appellee Douglas County Board of Equalization.

HANNON, INBODY, and CARLSON, Judges.

INBODY, Judge.

## I. INTRODUCTION

Omaha Country Club (OCC) appeals from the May 18, 2001, order of the Tax Equalization and Review Commission (Commission) affirming the decision of the Douglas County Board of Equalization (Board) and denying OCC's request for a decrease in the assessed values of the six parcels of land which are the subject of this appeal.

## II. STATEMENT OF FACTS

OCC is the owner or lessee of seven adjoining parcels of land which make up its 18-hole golf course, clubhouse and other structures, parking lot, green space, and some farmland. The farmland is not part of this appeal. Prior to 1997, the six properties subject to this appeal were leased under noncancelable, long-term leases effective until 2071. In 1997, subject property 4020-0000-01, consisting of 26.2 acres, was sold to OCC in fee simple for $45,064 or $1,720 per acre, and the lease for the property was terminated. OCC is the taxpayer for the parcel of land which it now owns, and under the terms of the leases, OCC is responsible for paying the real property taxes on the five parcels of leased property.

For the 2000 tax year, the Board assessed the value of the properties at $2,062,900, which is approximately $8,550 per acre. OCC filed protests with the Board, alleging that the owned and leased properties were overvalued, and requested a reduction of the assessed values. The Board denied OCC's request. OCC appealed to the Commission on August 17, 2000. The issue before the Commission was whether the subject properties should be assessed as if they were fee simple or whether the effect of long-term leases affecting the privileges pertaining to the properties should have been considered by the Board. In other words, how do the leased fee estate and leasehold estate affect the actual or fair market value of the real property at issue. The leased fee estate is an ownership interest held by the landlord who is

transferring specified rights, such as right to use and occupancy, to the lessee. *The Appraisal of Real Estate*, Appraisal Inst. (11th ed. 1996). The leasehold estate is the interest held by the lessee through a lease which transfers specified rights, such as the right to use and occupancy, to the lessee. *Id.*

A telephonic hearing was held on February 26, 2001, and the Commission issued its order on May 18 upholding the Board's decision and denying OCC's request for a reduction in the assessed values of the properties. The Commission determined that the "actual or fair market value of the real property can only be ascertained by determining the value of the fee simple estate, including the Leasehold Estate, the Leased Fee Estate, and any severed estates." The Commission also determined that the evidence presented by OCC, namely the appraisal by Patrick Morrissey and letter from John Elliott, were not credible evidence because both failed to adhere to the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) and valued only the leased fee estate. Thus, the Commission concluded that although OCC presented evidence that the rents due under the lease are below market and constitute evidence by which the leased fee estate value can be determined, OCC did not present any evidence of the value of the leasehold estate. Therefore, the actual or fair market value of the subject properties could not be determined. As a result, the Commission found that OCC, by failing to produce clear and convincing evidence, did not overcome the presumption in favor of the Board. OCC has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

OCC assigns and argues that the Commission erred in affirming the Board's decision and denying OCC's request for a reduction in the assessed values of the properties. More specifically, OCC contends that the Commission erred because it (1) found that OCC did not overcome the statutory presumption of the validity of the Board's assessment, (2) disregarded the existence of a recent comparable sale for less than the current assessed value, (3) disregarded the effect of long-term leases for below-market rents on the subject properties, (4) found that OCC's proposed valuations separated the leasehold estates and leased fee

estates, and (5) failed to give proper consideration to the appraisal and letter submitted by OCC as evidence.

## IV. STANDARD OF REVIEW

Neb. Rev. Stat. § 77-5019(5) (Supp. 2001) provides that appellate review of a Commission decision shall be conducted for error on the record. When reviewing an order for errors appearing on the record, the appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000). However, in instances where an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *County of Douglas v. Nebraska Tax Equal. & Rev. Comm.*, 262 Neb. 578, 635 N.W.2d 413 (2001).

## V. ANALYSIS

OCC contends that the Commission erred in upholding the Board's decision and denying OCC's request for a reduction in the assessed values of the subject properties.

### 1. STATUTORY PRESUMPTION

There is a presumption that a county board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. *Schmidt v. Thayer Cty. Bd. of Equal.*, 10 Neb. App. 10, 624 N.W.2d 63 (2001).

The burden of proof is on the taxpayer to establish the taxpayer's contention that the value of the taxpayer's property has been arbitrarily or unlawfully fixed by the county board of equalization at an amount greater than its actual value, or that its value has not been fairly and properly equalized when considered in connection with the assessment of other property and that such disparity and lack of uniformity result in a discriminatory, unjust,

and unfair assessment. *Newman v. County of Dawson*, 167 Neb. 666, 94 N.W.2d 47 (1959). Such a burden is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the taxpayer's property, when compared with valuations placed on other similar properties, is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain legal duty, and not mere errors of judgment. *Id.*

In the present case, the only evidence regarding the valuation of the subject properties was the 1997 sale of subject property 4020-0000-01; the letter of Elliott, a certified public accountant; the appraisal report of Morrissey, a certified general appraiser; and the affidavit of Len Buckwalter, Douglas County chief deputy assessor. We will proceed to discuss each in turn.

### (a) Comparable Sale

OCC offered the 1997 sale of subject property 4020-0000-01, consisting of 26.2 acres, to OCC in fee simple for $45,064 or $1,720 per acre as evidence of a comparable sale in order to establish the actual value of the subject properties.

The term "sales comparison approach" or "market approach" means "a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised." 350 Neb. Admin. Code, ch. 50, § 001.16 (2000). A single sale may in some instances provide evidence of market value. *Firethorn Invest. v. Lancaster Cty. Bd. of Equal.*, 261 Neb. 231, 622 N.W.2d 605 (2001).

The Commission disregarded OCC's contention that the sale price of parcel 4020-0000-01 represented the actual or fair market value of the real property, since the sale price only represented the value of the leased fee estate because that was all the seller had to sell. As a result, the Commission held that the 1997 sale could not be used as a comparable sale to determine the actual value of the entire property, including the entire bundle of rights associated with fee simple ownership. Based upon our review of the record, we cannot say that the Commission erred in making the determination that the 1997 sale only reflected the value of the leased fee estate and therefore could not be used to determine the actual value of the entire property.

### (b) Elliott's Letter

OCC submitted the letter from Elliott to support its proposition that the subject properties were overvalued because the effect of long-term leases upon the properties should have been taken into account by the assessor.

Elliott stated in his letter:

> For the purpose of monetary valuation, property has no value unless there is a prospect that it can be exploited by human beings. Since the property is under a non-cancelable lease, there is no opportunity for exploitation or to accrue more value to the property than the income from the lease payments.

In order to determine the value of the real estate, Elliott calculated the present value of the stream of lease payments that would be acquired by the buyer. Under this analysis, Elliott opined that reasonable fair market values for the properties are as follows:

| Key Number | Value |
| --- | --- |
| 4019-0000-01 | $233,469 |
| 4018-0006-01 | $158,351 |
| 4018-0010-01 | $124,419 |
| 4021-0002-01 | $142,678 |
| 4021-0004-01 | $ 42,618 |

We note that Elliott offered no opinion of value for parcel 4020-0000-01.

The Commission determined that Elliott considered only the income stream to the owner of the leased fee interest and thus valued only the leased fee estate. As a result, the Commission found that the letter had valued only the leased fee estate and was not credible evidence of the actual or fair market value of the subject properties, including all the estates. The Commission also found Elliott's letter to be noncredible because it was not made under oath in compliance with the provisions of 442 Neb. Admin. Code, ch. 4, § 010 (1999), which states that the testimony of witnesses may be taken by (1) affidavit, (2) deposition, (3) oral testimony, and (4) videotape of an examination conducted prior to the time of the hearing for use at the hearing. We agree with the Commission's determination that because Elliott's letter was not in compliance with the Nebraska Administrative

Code, it was not credible. Further, we also agree that Elliott's letter estimated only the value of the income stream to the owner of the leased fee estate and never estimated the value of the leasehold estate. Therefore, we cannot say that it was error for the Commission to determine that Elliott's letter was not credible evidence of the actual value of the subject properties.

### (c) Morrissey's Appraisal Report

OCC submitted the appraisal report as support for its contention that the effect of the long-term leases on the subject properties should have been taken into consideration when making an assessment for tax purposes.

Morrissey specifically states in his report that it should be considered a " 'Restricted Appraisal Report' "; is restricted to use by the party to whom it is addressed, OCC's attorney; and could not be fully understood without additional information contained in Morrissey's work file.

From the report, it appears that Morrissey calculated the value of the reversion and the value of income stream, which he then added together in order to obtain the total value. In Morrissey's opinion, the market value of the subject properties is $5,000 per acre. Morrissey then used a mathematical calculation to reduce the value of each subject property to its present worth. According to Morrissey, the present values of the subject properties are as follows:

| Key Number | Value |
| --- | --- |
| 4018-0006-01 and 4018-0010-01 | $37,106 |
| 4019-0000-01 | $34,970 |
| 4020-0000-01 | $10,001 |
| 4021-0002-01 and 4021-0004-01 | $25,449 |

The Commission first determined that it would not be proper to review the appraisal report in the proceedings because it was a restricted appraisal report which was intended to be used only by the client for whom it was prepared. The comment to Standards Rule 2-2 of the USPAP, Appraisal Standards Board of the Appraisal Foundation (1999), which governs real property appraisal reports, states: "When the intended users include parties other than the client, either a Self-Contained Appraisal Report or a Summary Appraisal Report must be provided. When

the intended users do not include parties other than the client, a Restricted Use Appraisal Report may be provided." The USPAP defines client as "the party or parties who engage an appraiser (by employment or contract) in a specific assignment." Because the Commission was not the client, the Commission determined that the restricted appraisal report was not appropriate for use in these proceedings. However, the Commission did determine that the restricted appraisal report separated the leased fee estate and leasehold estate and thus was not credible evidence of the actual or fair market value of the subject properties.

It appears from Morrissey's report that he determined the value of the leased fee estate and the value of the leasehold estate and that by adding the two values together, he arrived at the value of each of the subject properties. However, we note that Morrissey stated that the report could not be fully understood without additional information contained in his work file. This additional information was not included in the evidence before the Commission, which means that his report cannot be fully understood. Upon our review of the record, we cannot say that the Commission erred in determining that Morrissey's report was not credible evidence.

### (d) Affidavit of Buckwalter

Buckwalter stated that he was responsible for the values assigned to the subject properties involved in this dispute. According to Buckwalter, the parcels in question were last reappraised in 1998 as part of a simultaneous reappraisal of 18 golf courses for the 1999 tax year. Buckwalter stated that the values of the subject properties were originally not changed for the 2000 tax year, but were subsequently increased 7 percent by the order of the Commission.

According to Buckwalter, the values for the subject properties, as assigned by the county assessor, are as follows:

| Key Number | 2000 Value |
|---|---|
| 4018-0006-01-43 | $340,700 |
| 4018-0010-01-43 | $283,600 |
| 4019-0000-01-43 | $736,200 |
| 4020-0000-01-43 | $224,000 |

4021-0002-01-43          $ 87,000
4021-0004-01-43          $391,400

The assessed values equate to approximately $8,550 per acre.

The Commission found that OCC had not overcome the presumption that the Board had faithfully performed its official duties in making an assessment and had acted upon sufficient competent evidence to justify its action. Therefore, the Commission affirmed the Board's decision to deny a reduction in the assessed values and ordered OCC to pay the assessed amounts listed above.

OCC has the burden to prove that the value of the subject properties was arbitrarily or unlawfully fixed by the Board at an amount greater than the actual value. This burden is not met by showing a mere difference of opinion. No evidence was presented which established clearly and convincingly that the valuations placed upon the subject properties, when compared with valuations placed on other similar properties, was grossly excessive and was the result of a systematic exercise of intentional will or failure of plain legal duty, and not mere errors of judgment. Because the evidence presented simply showed that Elliott, Morrissey, and Buckwalter differed in opinion as to the value of the subject properties, we find that OCC did not meet its burden of proving that the value of the subject properties was arbitrarily or unlawfully fixed by the Board at an amount greater than the actual value. Therefore, based upon our review of the record, we cannot say that the Commission erred in determining that OCC failed to overcome the presumption that the Board had faithfully performed its official duties in making an assessment and had acted upon sufficient competent evidence to justify its action.

## 2. EFFECT OF LONG-TERM LEASE

Under Nebraska law, real property "shall mean all land, . . . improvements, . . . and all privileges pertaining to real property." 350 Neb. Admin. Code, ch. 10, § 001.01 (2000). Privileges related to real property is defined as "the right to sell, lease, use, give away, or enter and the right to refuse to do any of these. All rights may or may not be vested in one owner or interest holder." 350 Neb. Admin. Code, ch. 10, § 001.01F (2000).

Nebraska law also provides that all real property not exempt from taxation is to be valued at its actual value. Neb. Rev. Stat. § 77-201(1) (Cum. Supp. 2000). Further, 350 Neb. Admin Code, ch. 10, § 002.01A (2000), requires real property, except agricultural or horticultural land, to be valued at 100 percent of its actual value. For the purpose of taxing real property, actual value means the real property's market value in the ordinary course of business. Neb. Rev. Stat. § 77-112 (Cum. Supp. 1998). Additionally, 350 Neb. Admin. Code, ch. 10, § 001.15 (2000), defines actual value as

> the market value or fair market value of real property in the ordinary course of trade. It is the most probable price expressed in terms of money that a property will bring if exposed for sale in the open market or in an arm's-length transaction between a willing seller and willing buyer, both of whom are knowledgeable concerning all the uses to which the real property is adapted and for which it is capable of being used.

Actual value, market value, and fair market value mean exactly the same thing. *Xerox Corp. v. Karnes*, 217 Neb. 728, 350 N.W.2d 566 (1984).

This same issue was considered by the Supreme Court of Florida in *Schultz v. TM Florida-Ohio Realty LTD.*, 577 So. 2d 573 (Fla. 1991). In *Schultz*, the subject property was encumbered by a 22-year lease for below-market rent which commenced in 1970. The court stated that " 'the assessed value of the land must represent all the interests in the land. This means that despite the mortgage, lease, or sublease of the property, the landowner will still be taxed as though he possessed the property in fee simple.' " (Emphasis omitted.) *Id.* at 575 (quoting *Dept. of Revenue v. Morganwoods Greentree, Inc.*, 341 So. 2d 756 (Fla. 1976)). Thus, the court held that the valuation of property must represent the value of all interests in the property, i.e., the fair market value of the unencumbered fee.

A similar result was reached in *Caldwell v. Dept. of Revenue*, 122 Ariz. 519, 521, 596 P.2d 45, 47 (Ariz. App. 1979), where the court stated: "The fact that an unfavorable lease may make the property less desirable to prospective buyers does not affect its full cash value for tax valuation." The court held that the

combined value of the lessee's and lessor's interests under a long-term lease are subject to taxation.

In *Matter of County Dollar Corp. v. City of Yonkers*, 97 A.D.2d 469, 467 N.Y.S.2d 666 (1983), the taxpayer contended that the actual income was not reflective of the rental market, that it was in fact submarket, and that a capitalization process using the actual income did not reflect the true value of the property. The Special Term of the Supreme Court of Westchester County upheld the tax commission's determination, stating: " 'It is elementary that "if contract rent is to be ignored, it must be demonstrated by clear, convincing evidence that the contract rent is below the true market." ' " *Id.* at 472, 467 N.Y.S.2d at 669 (quoting *Caroldee Realty Corp. v. Board of Assessors*, 73 Misc. 2d 41, 340 N.Y.S.2d 774 (1972)). On appeal, the Appellate Division of the New York Supreme Court stated:

> "[T]he existence of an outstanding lease at an unrealistically low rental for a long term, not representing the fair rental value of the property, is not to be used as a basis for calculating actual value. Thus, the true value of the property for assessment purposes is to be ascertained as if unincumbered [sic] by such a lease."

*Matter of County Dollar Corp. v. City of Yonkers*, 97 A.D.2d at 472, 467 N.Y.S.2d at 670 (quoting *People ex rel. Gale v. Tax Comm.*, 17 A.D.2d 225, 233 N.Y.S.2d 501 (1962)).

In *Nance v. State Tax Com'n, of Missouri*, 18 S.W.3d 611 (Mo. App. 2000), the taxpayer entered into a 99-year lease agreement of the subject property, with the option to buy. In 1962, the taxpayer subleased the property to a development company. The taxpayer exercised the option to buy the subject property in 1970. Upon review, the commission determined that the lease created two property interests: the leasehold, owned by the development company, and the leased fee, owned by the taxpayer. The commission held that the fair market value of the property is the sum of the separately valued interests and that the difference between the fair market value of the unencumbered fee simple and the value of the leased fee estate and the leasehold estate equals the impact of the lease on the subject property. On appeal, the Missouri Court of Appeals stated:

Appellant may be correct in asserting that nobody would purchase the leased fee at its present terms considering the tax burden. However, assessing the value of the leased fee interest in this case as zero would go against public policy. As Respondent points out, if a property owner could unilaterally alienate his property by lease or by other actions that make the property have no value to him, the taxing authority could not collect appropriate property tax because of the taxpayer's unilateral action. If the property were not valued and assessed as unencumbered by the lease, the taxpayer appears to be afforded a tax cut because of the poor judgment of his predecessors.

*Id.* at 619.

These cases require that the income attributed to the leased fee estate under a long-term lease be considered as one of the factors used to determine the actual or fair market value of the real property. However, as these cases demonstrate, the actual or fair market value of the real property can only be ascertained by first determining the fee simple value, including the value of the leasehold estate, the leased fee estate, and any other severed estate.

■ Therefore, based upon our examination of Nebraska law and jurisprudence from other states, we hold that the actual value of real property for tax purposes shall be the value which a willing buyer would be willing to pay for the fee simple interest.

## VI. CONCLUSION

For the reasons discussed above, we find that the Commission did not err in finding that OCC failed to overcome the presumption that the Board had faithfully performed its duties and had acted upon sufficient evidence to justify its action. We also hold that for tax purposes, the actual value of real property shall be the value which a willing buyer would be willing to pay for the fee simple interest. Therefore, the decision of the Commission is affirmed.

AFFIRMED.